IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PHYLLIS JEAN GREEN, | ) | Case No. 5:17-cv-2366 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Phyllis Jean Green, seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for supplemental security income and disability benefits under Titles II and XVI of the Social Security Act (the "Act").  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the ALJ applied the correct legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

## II.     Procedural History

On May 27, 2014, Green applied for disability insurance benefits and supplemental security income.  (Tr. 201, 208).  Green alleged that she became disabled on April 14, 2014, due to "problems with eyesight, back pain, right shoulder pain, leg pain and numbness, depression, and bladder infections."  (Tr. 60, 72, 201); ECF Doc. 15, Page ID# 571.  The Social Security

Administration denied Green's application initially and upon reconsideration. (Tr. 60–83, 86–111). Green requested an administrative hearing. (Tr. 141–42). Administrative Law Judge ("ALJ") Cynthia K. Hale heard Green's case on June 16, 2016, and issued a written decision denying her claim on September 20, 2016. (Tr. 14–25, 30). On September 7, 2017, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1–5, 200). On November 9, 2017, Green filed a complaint to seek judicial review of the Commissioner's decision. ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Green was born on April 19, 1966, and was 47 years old on the alleged onset date. (Tr. 34, 201). She attended high school through the 12th grade.[1] (Tr. 34, 240). She has prior work experience as a short order cook, medical records clerk, cashier, and pharmacy clerk. (Tr. 35–38, 56).

### B.    Relevant Medical Evidence – Physical Limitations

On May 2, 2013, Green was admitted to Welch Community Hospital for a hysterectomy, following a "[l]ong history of abnormal uterine bleeding, lower abdominal pain," and ovarian cysts. (Tr. 338). During her surgery, Green sustained an incidental incision into her bladder, which was immediately repaired. (Tr. 328). On May 23, 2013, Green presented to Dr. Charles Richard Daniel, Jr., M.D., for a follow-up, and Dr. Daniel noted that Green's bladder appeared normal. (Tr. 378). At a follow-up on June 9, 2013, Dr. Amir Eshel, M.D., noted that Green complained of bladder spasms and frequent urination, and he encouraged Green to increase hydration and urination. (Tr. 313).

---

[1] At the ALJ hearing, Green testified that she received a "certificate of completion" for the 12th Grade, but did not receive a diploma because she did not have enough credits to graduate. (Tr. 34–35).

On October 3, 2013, Green presented to Dr. David Eells, M.D., at Welch Community, with complaints of frequent urination and urgency.  (Tr. 312).  Dr. Eells determined that Green had a urinary tract infection ("UTI"), and prescribed an antibiotic.  (Tr. 312).  At a follow-up on November 18, 2013, Dr. Eells noted that Green recovered from her UTI, but complained of chronic back and leg pain.  (Tr. 310).

On June 16, 2014, Green saw Dr. Paul Ratcliff, Jr., D.O., with complaints of right shoulder pain.  (Tr. 389).  Dr. Ratcliff ordered an x-ray of Green's right shoulder, which revealed no fracture or dislocation, and normal-appearing joints, bones, and soft tissues.  (Tr. 389).

On December 11, 2014, Green saw Dr. Jose Oyco, M.D., with pain in her right shoulder and arm.  (Tr. 432–33).  Green reported that she hurt her shoulder in November 2012, but did not seek treatment for it because it did not bother her.  (Tr. 432).  Dr. Oyco diagnosed Green with traumatic arthritis in her right shoulder, sciatica,[2] degenerative osteoarthritis in her spine, and anxiety with depression.  (Tr. 432).  Dr. Oyco prescribed Green a pain reliever and referred her for an x-ray of her shoulder and arm upon request.  (Tr. 432–33).  On February 26, 2015, Dr. Philip Branson, M.D., and Physician's Assistant Gregory Southers determined by x-ray that Green had tendinitis[3] and adhesive capsulitis[4] in her right shoulder, and prescribed an injection and physical therapy.  (Tr. 445).  At a follow-up with Dr. Oyco in May 2015, Green reported that she had pain in her back and legs; Dr. Oyco prescribed her additional pain relievers.  (Tr. 438).

---

[2] Sciatica is pain, weakness, numbness, or tingling in the leg, caused by an injury to or pressure on the sciatic nerve.  *Sciatica*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000686.htm (last visited Oct. 2, 2018).

[3] Tendinitis is swelling or inflammation in a tendon, which may result from an injury or occur as a tendon loses elasticity with aging.  *Tendinitis*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/001229.htm (last visited Oct. 2, 2018).

[4] Adhesive capsulitis (also known as "frozen shoulder") is pain and loss of motion in the shoulder due to inflammation.  *Frozen Shoulder*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000455.htm (last visited Oct. 2, 2018).

On March 2, 2015, Green presented to Marden Rehabilitation Associates for physical therapy.  (Tr. 486–88).  Green rated her shoulder pain as a 5 out of 10, and stated that activity had caused the pain to increase to a 10 out of 10.  (Tr. 491).  Physical Therapist Richard Hatfield recommended therapy three times per week for six weeks.  (Tr. 489, 494).  On March 20, 2015, Green again presented for physical therapy, and Physical Therapist Erica Webb noted that Green's tolerance for treatment was poor, that she had difficulty performing exercises due to pain, but that she "deomonstrate[d] good motion" during therapy.  (Tr. 495).  On February 29, 2016, Marden discharged Green as a patient for failing to follow up with treatment.  (Tr. 497–98).  The discharge notes stated that Green had attended only two sessions of physical therapy, and she had no change in her symptoms.  (Tr. 498).

On September 17, 2015, Green presented to Dr. Andres Rago, M.D., at Keycare Medical Center, for treatment of anxiety, depression, lower back pain, and poor vision.  (Tr. 461–63).  Dr. Rago refilled Green's prescriptions, and adjusted some of her pain relievers.  (Tr. 463).  At a follow-up in May 2015, Dr. Rago adjusted Green's antidepressants and prescribed ibuprofen for her pain.  (Tr. 472).

### C.     Relevant Medical Evidence – Mental Limitations

On July 30, 2014, Green saw Todd Burnette at Southern Highlands Community Mental Health Center ("Southern Highlands") for a clinical evaluation.  (Tr. 409–14).  Green reported symptoms of bipolar disorder, including severe depression, anxiety, paranoia, sleep change, withdrawal, impulsivity, suspiciousness, phobia, distractibility, loss of interest in activities, and intrusive thoughts.  (Tr. 409).  She reported that her childhood abuse made her anxious and depressed, and that she had mood swings that became worse as a hearing against the man who sexually abused her was drawing closer.  (Tr. 410).  Green reported that she had one friend, had

4

family support, and her hobbies included housework, gardening, cooking, and watching television.  (Tr. 411).  She reported that she was a high school graduate and was in regular education classes.  (Tr. 411).  Burnette noted that Green's mood and appearance were appropriate, she was oriented, her thought content was appropriate, her memory was intact, and she had good insight and judgment.  (Tr. 411).  Burnette noted that Green's coping ability was overwhelmed, and she was socially withdrawn.  (Tr. 411).  Burnette diagnosed Green with "bipolar I disorder . . . severe with psychotic feature," and recommended treatment through individual therapy.  (Tr. 412–13).

On August 28, 2014, Green saw Dr. Nancy Davidson, D.N.P., at Southern Highlands for a psychiatric evaluation.  (Tr. 415–19).  Green reported that her anxiety and depression had worsened over the prior two years, and she denied having been treated with medication in the past.  (Tr. 415–16).  Green reported that she had recently completed a trial against her foster parents' son, who was found guilty of child molestation, and that she was a witness in a trial for the murder of her foster father.  (Tr. 418).  Dr. Davidson noted that Green was anxious and fearful, and that she had appropriate thought content and attention, alert cognition, intact memory, average intelligence, and baseline insight/judgment.  (Tr. 418).  Green reported that she spent most of her day at home.  (Tr. 418).  Dr. Davidson diagnosed Green with bipolar disorder, gave her a global assessment of functioning score of 70,[5] prescribed her an antidepressant and a bipolar medication, and stated that her prognosis was "fair."  (Tr. 418–19).  At follow-ups in October 2014, December 2014, February 2015, and March 2015, Green reported that her

---

[5] The global assessment of functioning is a scale used to report an individual's overall functioning at a particular point in time.  AM. PSYCH. ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed. 2000).  A score in the range of 61 to 70 indicates that an individual has "some mild symptoms (e.g., depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.* (emphasis omitted).

medications helped her symptoms.  (Tr. 420, 422, 447, 448, 452).  At a follow-up in August 2015, Green reported that she was out of medications, she reported that her anxiety and depression symptoms had worsened, and Dr. Davidson increased her antidepressant prescription. (Tr. 455–56).  At a follow-up in September 2015, Green reported that her depression and anxiety had slightly improved, but that she continued to have mood swings.  (Tr. 458).

### D.    Opinion Evidence

#### 1.    State Agency Reviewing Physicians – Physical Limitations

On October 24, 2014, Dr. Thomas Lauderman, D.O., reviewed Green's records and opined that she could occasionally lift up to 50 pounds, frequently lift up to 25 pounds, stand and/or walk for 6 hours, and sit for 6 hours in an 8-hour workday.  (Tr. 66, 78).  He stated that Green was unlimited in her ability to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and that she could frequently climb ladders, ropes, and scaffolds.  (Tr. 66–67, 78–79).  He stated that Green should avoid concentrated exposure to extreme cold, vibration, and hazards (machinery, heights, etc.), and that she was unlimited in her ability to tolerate extreme heat, wetness, humidity, noise, and fumes, odors, dusts, gasses, and poor ventilation.  (Tr. 67, 79).  He also stated that Green had an unlimited ability to push and/or pull, "other than shown, for lift and/or carry."  (Tr. 66, 78).  On January 20, 2015, Dr. Rabah Boukhemis, M.D., reviewed Green's records and gave the same opinion as Dr. Lauderman, adding only that Green should avoid even moderate exposure to vibration.  (Tr. 92–94, 105–07).

#### 2.    State Agency Reviewing Psychologists – Mental Limitations

On October 7, 2014, Dr. James W. Bartee, Ph.D., reviewed Green's records.  Dr. Bartee opined that Green was not significantly limited in her ability to understand, remember, carry out simple or detailed instructions, maintain attention and concentration, perform according to a

6

schedule or routine, make simple work-related decisions, ask simple questions or request assistance, maintain socially appropriate behavior, be aware of normal hazards and take precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently.  (Tr. 67–69, 79–81).  Dr. Bartee opined that Green had limitations in sustained concentration and persistence, social interaction, and adaptation.  (Tr. 68–69, 80–81).  He stated that Green was moderately limited in her ability to work in coordination with or proximity to others without being distracted, to interact appropriately with the general public, to accept instructions, to respond appropriately to criticism from supervisors, and to respond appropriately to changes in the work setting.  (Tr. 68–69, 80–81).  On January 12, 2015, Dr. Paula J. Bickman, Ph.D., reviewed Green's records and gave the same opinion as Dr. Bartee.  (Tr. 94–96, 107–09).

### 3.    Consultative Examination by Dr. Andres Rago, M.D.

On September 24, 2014, Green saw Dr. Rago for a physical disability examination at the request of the West Virginia Disability Determination Service.  (Tr. 400–04).  Dr. Rago stated that Green complained of a vision problem, back pain, pain in the right shoulder, leg pain and numbness, and a bladder infection.  (Tr. 400).  Dr. Rago noted that Green reported having eye problems since she was young, requiring several surgeries that have been ultimately unable to help her vision in her left eye.  (Tr. 400).  He noted that Green had 20/200 visual acuity in her left eye, and 20/40 visual acuity in her right eye with corrective lenses.[6]  (Tr. 400).  He also

---

[6] Visual acuity is a measurement used to describe a person's ability to see.  *See Visual Acuity Test*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/003396.htm (last visited Oct. 2, 2018).  The top number describes the distance the individual stands from the testing chart (typically 20 feet), and the bottom number indicates the distance at which a person with normal eyesight could read the same line that the individual correctly reads.  *Id.*  For example, a 20/40 visual acuity indicates that the individual can read at 20 feet what a person with normal eyesight could read at 40 feet, and a 20/200 visual acuity indicates that the individual can read at 20 feet what a person with normal eyesight could read at 200 feet.  *Id.*  An individual will

noted that Green had urinary incontinence for several years, after her hysterectomy and UTI. (Tr. 400).  As to Green's pain, Dr. Rago noted that Green's lower back pain was related to a lower spine fracture, and that her pain worsened with prolonged sitting, standing, and bending. (Tr. 400–01).  He noted that surgery had been recommended "years back," but Green refused the procedure.  (Tr. 401).  Dr. Rago stated that Green could walk without an assistive device, had no abnormal gait problems, and was able to stand from a seated position without difficulty. (Tr. 402).  He noted that Green could walk on her heals and toes with slight difficulty, and that she could not squat all the way without complaining of pain.  (Tr. 402).  He stated that Green had a "moderate limitation of motion" in her neck and right shoulder, no motor or sensory deficits, and no muscle weakness.  (Tr. 403).  He noted that Green might have developed some degenerative arthritis in her lower back, and that her prognosis was "anticipated to be encouraging" with her current medication and treatment.  (Tr. 404).

### 4.    Consultative Examination by Psychologist Teresa Jarrell

On September 25, 2014, Green saw Psychologist Teresa Jarrell for a mental status examination at the request of the West Virginia Disability Determination Service.  (Tr. 391–98). Jarrell noted that Green was attentive, cooperative, and polite during the examination; that she had a "serious and satisfactorily motivated attitude"; and that her "social functioning appeared mildly deficient."  (Tr. 391, 396).  Green reported that she did not like being in public, she wanted to stay closed up a lot, and she felt like she was being watched.  (Tr. 392).  Jarrell noted that green was physically, mentally, and sexually abused in foster care, and that she attended counseling every week or two weeks.  (Tr. 393).  Jarrell noted that Green took an antidepressant and bipolar medication.  (Tr. 393).  Green had normal thought process and content, and she had

---

meet the listing of impairments for loss of visual acuity if the remaining vision in the better eye is 20/200 or worse after best correction.  20 C.F.R. pt. 404, Subpt. P, App'x 1 § 2.02.

"moderately deficient" judgment and insight.  (Tr. 394).  Jarrell stated that Green's immediate memory was normal, her recent memory was "severely deficient," and her remote memory was "mildly deficient."  (Tr. 394).  She noted that Green had normal concentration and persistence, and a "mildly slow" pace.  (Tr. 394, 396).  Jarrell diagnosed Green with panic disorder, generalized anxiety disorder, somatic symptom disorder (pain), bipolar II disorder, and post-traumatic stress disorder.  (Tr. 394).  She stated that Green's prognosis was "very guarded with appropriate treatment and poor without."  (Tr. 396).  Jarrell noted that Green's typical daily activities included taking care of her personal hygiene, folding laundry, playing with her grandson, reading, sitting on the porch or looking out the window, preparing simple food, watching television, taking her medicine, and managing her benefits.  (Tr. 396).

     **E.**     **Relevant Testimonial Evidence**

Green testified at the ALJ hearing.  (Tr. 34–55).  Green testified that she went to school through the 12th grade, but did not have enough credits to graduate and never "got a GED or anything like that."  (Tr. 34–35).  She had prior work experience as a short order cook, medical records clerk, cashier, and pharmacy clerk.  (Tr. 35–38, 53–55, 56).  Green stated that her daughter lived with her and assisted her with her personal needs (getting dressed, tying her shoes, and shopping).  (Tr. 42, 45).  She lived in her ex-husband's house.  (Tr. 50).

Green stated that she stopped working in 2014 because her arm hurt, she could not see well enough to keep up with her job, and everyone at her job was angry with her because she could not keep up.  (Tr. 39).  She stated that she hurt her arm in November 2012, when she was stocking a cooler at work.  (Tr. 39).  She did not report her injury in 2012 because she was afraid she would lose her job.  (Tr. 39).  When asked when her arm hurt the most, Green stated that she would forget about her arm hurting, attempt to get a jug of milk or something from the

refrigerator, and then drop it because her arm hurt.  (Tr. 39–40).  She did not take pain medicine

for her arm in 2014, and that she received a cortisone shot that numbed the pain in her arm for

six months, but caused her neck to hurt.  (Tr. 40).  At the time of the hearing, the cortisone shot

had worn off, and she was again limited in what she could do with her arm.  (Tr. 40).  She stated

that her arm pain affected her ability to cook, clean, do yard work, and get dressed, and that she

did not drive because she was afraid to drive with her arm and that she would not be able to see

well.  (Tr. 41–42).  She stated that she would have difficulty twisting the lid off a soda bottle,

and that gripping was a problem.  (Tr. 42).  Green's doctor had recommended physical therapy,

which she said was unsuccessful, and that no doctor had recommended surgery for her arm.  (Tr.

43).  She stated that she could lift about 15 pounds with her left arm.  (Tr. 44).

Green testified that she had back pain every night, and that she could not lie on her back

because her tailbone hurt too badly.  (Tr. 43).  Her back pain caused her to not sleep well, and

that she got only about four hours of sleep each night.  (Tr. 43–44)  She got tired during the day

and took two 20-minute naps daily.  (Tr. 44).  She could walk for ten minutes before her feet felt

numb, that she could stand without walking for five minutes before her leg felt numb, and that

she could sit for 30 minutes, but less than an hour.  (Tr. 45–46).  She did not receive any

treatment, beyond medication, for her back pain.  (Tr. 51).

Green testified that she had eye vision problems her whole life, that she could only see a

"blur" out of her left eye, and that her right eye was getting worse.  (Tr. 47).  She wore glasses,

but, due to insurance issues and an inability to pay, she was unable to replace them after they

broke two years before the hearing.  (Tr. 47–48).  She stated that she left one of her jobs because

she could not see well enough to read a screen quickly, and that she felt like everyone was

getting mad at her.  (Tr. 53).

As to her mental ailments, Green testified that thinking about her past abuse caused her anxiety, which caused her chest to feel like it would explode.  (Tr. 48–49).  She stated that she had days when she could not sleep enough, she would feel depressed, and she would stay in her room for a week at a time.  (Tr. 49).  Her medications worked sometimes, but she would still have thoughts that triggered anxiety attacks.  (Tr. 49).  Green stated that she stopped going to Southern Highlands for treatment because she had trouble finding someone to take her to her appointments.  (Tr. 51).  She had problems with memory, including remembering her appointment dates and when to take her medication.  (Tr. 52).  She stated that she did not have problems with people, but that her anxiety caused her difficulty in dealing with people, and that she felt like everyone was out to get her.  (Tr. 52).  She stated that she was worried that people at her work would find out about her history of abuse, and that her fear was ongoing because everyone knew everyone in her town.  (Tr. 52–53).

Jennifer Schmidt, a vocational expert ("VE"), also testified at the hearing.  (Tr. 55–58).  The ALJ asked Schmidt whether a hypothetical individual with the same experience as Green could perform work, if that individual were:

> Limited to light work, but would need to be able to alternate between standing and sitting every 30 minutes for a brief position change.  Would need to have no job tasks that required peripheral or good bilateral vision.  Would need to avoid exposure to extreme cold and vibration and work hazards such as moving machinery and unprotected heights.  Would need to have no overhead reaching on the right, and no more than frequent handling with the right dominant hand.  And could only occasionally climb stairs, and never ladders, ropes or scaffolds, and would only occasionally be able to kneel, crawl, stoop, or crouch, and could only occasionally be around co-workers, the general public and supervisors.

(Tr. 56–57).  Schmidt testified that such an individual could work as a clerical router, office helper, and marker.  (Tr. 57).  Schmidt testified that any work would be precluded if the hypothetical individual: (1) also required a 15-minute break once a day; (2) were also off-task for

15 percent of the workday due to symptoms he was experiencing; or (3) would need to leave early or be absent two workdays per month on a consistent basis.  (Tr. 57–58).

## IV.    The ALJ's Decision

On September 20, 2016, the ALJ issued a decision determining that Green was not disabled and denying her benefit applications.  (Tr. 14–25).  The ALJ determined that Green met the insured status requirements of the Social Security Act through September 30, 2019, and that she had not engaged in substantial gainful activity since April 14, 2014.  (Tr. 16).  The ALJ found that Green had the following severe impairments: degenerative disc disease of the lumbar spine, right shoulder impingement, post-traumatic stress disorder, generalized anxiety disorder, panic disorder, bipolar disorder, and decreased vision on the left.  (Tr. 16).  The ALJ determined that Green did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listing of impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 17).

The ALJ determined that green had the residual functional capacity ("RFC") to perform light work, but with the following restrictions:

> She must be able to alternate between sitting and standing every 30 minutes for a brief position change.  She can perform no jobs that require bilateral vision or peripheral vision.  She must avoid exposure to extreme cold, vibration, and work hazards such as moving machinery and unprotected heights.  She can perform no overhead reaching on the right.  No more than frequent handling with the right dominant hand.  She can only occasionally climb stairs.  She can never climb ladders, ropes, or scaffolds.  She can occasionally kneel, crawl, stoop, and crouch. She can occasionally interact with co-workers, supervisors, and the general public.

(Tr. 18).

In assessing Green's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record.  (Tr. 18).  The ALJ stated that Green's

12

medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ found Green's complaints regarding the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 19).  The ALJ stated that the record did not indicate she had significant visual limitations, as she did not require significant treatment for her visual impairments, she did not follow up with her vision treatment referrals, and her visual impairments did not significantly affect her daily activities or ability to care for her personal hygiene and household chores.  (Tr. 21).  The ALJ also stated that the record did not show that her degenerative disc disease in her back caused significant limitations, as she had only mild to moderate symptoms, she received conservative treatment through medication, and she did not receive regular physical therapy, surgery, or epidural steroid injections.  (Tr. 21).  Furthermore, the ALJ stated that the record did not show significant limitations caused by Green's shoulder degeneration, because she had only moderately reduced range of motion, she did not report any loss of strength or sensation, she had only limited treatment by medication, and did not complete recommended physical therapy.  (Tr. 21).  The ALJ also noted that Green's mental impairments caused only mild to moderate limitations, as she underwent only limited treatment, managed her symptoms through medication, did not undergo regular therapy, did not require any emergency admissions due to her mental health symptoms, did not report any psychosis to her providers (except that she reported hallucinations to the consultative examiner), and did not exhibit significant difficulty with attention or concentration.  (Tr. 21–22).  Lastly, the ALJ noted that Green was able to engage in numerous daily living activities beyond what would be expected if her subjective complaints were consistent with the record, including cooking, cleaning, maintaining her personal hygiene, and handling her personal finances.  (Tr. 22).

Based on Green's RFC, age, education, and experience, the ALJ determined that Green was unable to perform any of her past relevant work, but that the Medical-Vocational Guidelines did not direct a finding of "not disabled." (Tr. 23). Thus, the ALJ relied on the VE's testimony to determine that Green could perform a significant number of other jobs. (Tr. 23–24). Such work included: clerical router, office helper, and marker. (Tr. 24). In light of her findings, the ALJ determined that Green was not disabled from April 28, 2014, through the date of her decision and denied Green's applications for disability insurance benefits and supplemental security income. (Tr. 24–25).

## V. Law & Analysis

### A. Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. §§ 405(g) and 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). Even if the court does not agree with the Commissioner's decision, or substantial

evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence. *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error. Accordingly . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)). Furthermore, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS

15

157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to supplemental security income or disability benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)–(v) and 416.920(a)(4)(i)–(v) ; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a) and 416.912(a).

### B.    Subjective Symptom Complaints

Green argues that substantial evidence did not support the ALJ's determination that her subjective symptom complaints were not fully credible.  ECF Doc. 14, Page ID# 567.  The Commissioner responds that the ALJ cited substantial, legitimate evidence to support her factual conclusions.  ECF Doc. 15, Page ID# 580.  Specifically, the Commissioner asserts that the ALJ evaluated the consistency of Green's subjective symptom complaints with: (1) objective

examination findings showing that Green had no significant mental deficits or abnormalities; (2) treatment notes showing that her symptoms could be managed through "conservative" measures and medication, and that she had only mild physical impairments; (3) Green's testimony regarding her ability to engage in normal activities of daily living; and (4) medical opinion evidence indicating that Green retained the ability to perform work involving limited contact with others.  *Id.* at 580–83.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e); The RFC is an assessment of a claimant's ability to do work despite her impairments.  *See Her v. Comm'r*, 203 F.3d 388 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments.").  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a).

A claimant's subjective symptom complaints may support a disability finding when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints, and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence.  *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 82 Fed. Reg. 49462, 49465 (Oct. 25, 2017) ("We will consider and individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").  In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the claimant's

efforts to alleviate her symptoms, and the type and efficacy of any treatment.  SSR 16-3p, 82 Fed. Reg. at 49465–66; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

Here, the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence when she determined that Green's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record.  42 U.S.C. §§ 405(g) and 1383(c)(3); *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059.  First, the ALJ applied proper legal standards by assessing Green's subjective symptom complaints based on their consistency with the medical and other evidence in the record, and clearly articulating that Green's subjective symptom complaints were not entirely consistent with that evidence.  *Jones*, 336 F.3d at 475–76; SSR 16-3p, 82 Fed. Reg. at 49465–66; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); (Tr. 19–22).  Further, substantial evidence supported the ALJ's determination that Green's subjective symptom complaints were not entirely consistent with the other evidence in the record, as evidence in the record showed that: (1) Green was able to manage her physical and mental symptoms through conservative treatment and medication, and did not undergo surgery, regular physical or mental health therapy, or regular pain-relieving injections ; (2) her mental and physical impairments caused only mild to moderate symptoms, including a moderately reduced range of motion in her arm and moderate difficulties with social interactions; (3) her visual impairment did not preclude her from engaging in her daily living activities, except driving, and she was able to see in one of her eyes with glasses; (4) she retained a normal though process and had no significant deficits in

concentration or attention; and (5) she was able to stand from a seated position without difficulty, walk without assistance, care for her personal hygiene, fold laundry, play with her grandson, read, prepare simple food, watch television, manage her own medications, and manage her benefits (finances).  *Rogers*, 486 F.3d at 241 (Tr. 66–69, 78–81, 92–96, 105–09, 391–96, 400–04, 411, 418–20, 422, 432–33, 438, 445, 447–48, 452, 455–58; 486–91, 494–95, 497–98, 461–63, 472).  Furthermore, Green's GAF of 70 indicated that she could function relatively well and maintain meaningful interpersonal relationships, despite her mental health impairments.  (Tr. 418–19); Am. Psych. Ass'n, Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 2000).  Thus, the ALJ properly determined that the objective medical evidence did not confirm the alleged severity of Green's symptoms, and this court may not disturb the ALJ's finding that Green's subjective symptom complaints were not entirely consistent with the objective medical and other evidence in the record.  42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Blankenship*, 874 F.2d at 1123.

### C.    Ability to Perform Work

Green argues that substantial evidence did not support the ALJ's determination that she had the ability to perform work-related activity on a full-time or equivalent basis.  ECF Doc. 14, Page ID# 567–68.  Specifically, Green contends that had the ALJ credited her testimony regarding her anxiety, depression, and sleep difficulties, the VE's testimony would have shown that she lacked the capacity to engage in any work-related activity on a full-time or equivalent basis.  *Id.* at 568.  The Commissioner responds that the ALJ applied proper legal standards and reached a decision supported by substantial evidence in determining that Green had the ability to perform work in the national economy.  ECF Doc. 15, Page ID# 583–84.  The Commissioner asserts that, based on the VE's testimony and Green's age, education, work experience, and

RFC, substantial evidence supported the ALJ's determination that Green could perform jobs existing in significant numbers in the national economy.  *Id.* at 584.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant could perform a significant number of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  An ALJ may determine that a clamant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC.  *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible."  *Lee*, 529 F. App'x at 715; *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

Substantial evidence supports the ALJ's determination that, based on the VE's testimony, Green had the ability to perform full time work available in significant numbers in the national economy.  Here, because the ALJ properly determined that Green's subjective symptom complaints were inconsistent with the objective medical evidence and other evidence in the

record, the ALJ was not required to include the limitations described in Green's subjective symptom complaints in the RFC. *Blacha*, 927 F.2d at 231; *Blankenship*, 874 F.2d at 1123; *Lee*, 529 F. App'x at 715. Thus, the VE's testimony that Green could work as a clerical router, office helper, and marker, in response to the ALJ's hypothetical question tracking her determination that Green had the RFC to perform a range of light work with additional limitations, provided substantial evidence supporting the ALJ's determination that Green could perform full time work available in significant numbers in the national economy. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; (Tr. 18, 56–57). Accordingly, the ALJ applied proper legal standards and reached a decision supported by substantial evidence when he determined that Green was able to perform full time work available in significant numbers in the national economy.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Court AFFIRM the Commissioner's final decision denying Plaintiff, Phyllis J. Green's applications for disability insurance benefits and supplemental security income.

Dated: October 17, 2018

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).